THE WESTON FIRM
GREGORY S. WESTON (239944)
JACK FITZGERALD (257370)
888 Turquoise Street
San Diego, CA 92109
Telephone: (858) 488-1672
Facsimile: (480) 247-4553
greg@westonfirm.com
jack@westonfirm.com

BECK & LEE BUSINESS TRIAL LAWYERS
JARED H. BECK (233743)
ELIZABETH LEE BECK (233742)
Courthouse Plaza Building
28 West Flagler Street, Suite 555
Miami, FL 33130
Telephone: (305) 789-0072
Facsimile: (786) 664-3334
jared@beckandlee.com
elizabeth@beckandlee.com

**Attorneys for Plaintiffs and the Proposed Class**

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

CATS AND DOGS ANIMAL HOSPITAL,
INC.; ASTRO APPLIANCE SERVICE;
BLEEDING HEART, LLC d/b/a
BLEEDING HEART BAKERY;
CALIFORNIA FURNISHINGS, INC. d/b/a
SOFA OUTLET; CELIBRÉ, INC.; J.L.
FERRI ENTERTAINMENT, INC. d/b/a
ADULT SOCIALS; LE PETITE
RETREAT DAY SPA, LLC; SAN
FRANCISCO BAY BOAT CRUISES, LLC
d/b/a MERMAIDS CRUISE; WAG MY
TAIL, INC.; and ZODIAC RESTAURANT
GROUP, INC. d/b/a SCION
RESTAURANT, on behalf of themselves
and all others similarly situated,

                                        Plaintiffs,

        v.

YELP! INC.,

                                        Defendant.

Case No: 2:10-cv-01340-VBF-SS
Pleading Type: Class Action

**FIRST AMENDED COMPLAINT FOR:**

**EXTORTION;**

**ATTEMPTED EXTORTION;**

**INTENTIONAL INTERFERENCE
WITH PROSPECTIVE BUSINESS
ADVANTAGE; AND**

**VIOLATIONS OF THE UNFAIR
COMPETITION LAW, CAL. BUS &
PROF. CODE § 17200.**

**DEMAND FOR JURY TRIAL**

1     Plaintiffs Cats and Dogs Animal Hospital, Inc., Astro Appliance Service,

2 Bleeding Heart, LLC d/b/a Bleeding Heart Bakery, California Furnishings, Inc.

3 d/b/a Sofa Outlet, Celibré, Inc., J.L. Ferri Entertainment, Inc. d/b/a Adult Socials,

4 Le Petite Retreat Day Spa, LLC; San Francisco Bay Boat Cruises, LLC d/b/a

5 Mermaids Cruise, Wag My Tail, Inc. and Zodiac Restaurant Group, Inc. d/b/a

6 Scion Restaurant, on behalf of themselves and all others similarly situated, by and

7 through undersigned counsel, hereby sue Defendant Yelp! Inc. and, upon

8 information and belief and investigation of counsel, allege as follows:

9 **JURISDICTION AND VENUE**

10     1.    This Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) (The

11 Class Action Fairness Act) because the matter in controversy exceeds the sum or

12 value of $5,000,000 exclusive of interest and costs and more than two-thirds of the

13 members of the Class reside in states other than that state of which Defendant is a

14 citizen.

15     2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because at

16 least one Plaintiff resides in and suffered injuries as a result of Defendant's acts in

17 this district, many of the acts and transactions giving rise to this action occurred in

18 this district, and Defendant (1) is authorized to conduct business in this district and

19 has intentionally availed itself of the laws and markets of this district through the

20 promotion, marketing, and sale of advertising in this district; (2) resides in this

21 district, and (3) is subject to personal jurisdiction in this district.

22 **PARTIES**

23 **The Non-Sponsor Plaintiffs**

24     3.    Plaintiff Cats and Dogs Animal Hospital, Inc. ("Cats and Dogs") is a

25 California corporation with its principal place of business in Long Beach,

26 California.

27

First Amended Complaint

4. Plaintiff Astro Appliance Service ("Astro") is a sole proprietorship licensed by California State and San Mateo County, with its principal place of business in San Carlos, California.

5. Plaintiff J.L. Ferri Entertainment, Inc. d/b/a Adult Socials ("Adult Socials") is a New York corporation with its principal place of business in New York, New York.

6. Plaintiff Le Petite Retreat Day Spa, LLC ("Le Petite Retreat") is a California limited liability corporation with its principal place of business in Los Angeles, California.

7. Plaintiff San Francisco Bay Cruises, LLC d/b/a Mermaids Cruise ("Mermaids Cruise") is a California limited liability corporation with its principal place of business in San Francisco, California.

8. Plaintiff Wag My Tail, Inc. ("Wag My Tail") is a California corporation with its principal place of business in Tujunga, California.

9. Plaintiff Zodiac Restaurant Group, Inc. d/b/a Scion Restaurant ("Scion") is a Washington, D.C. corporation with its principal place of business in Washington, D.C.

**The Sponsor Plaintiffs**

10. Plaintiff Bleeding Heart, LLC d/b/a Bleeding Heart Bakery ("Bleeding Heart Bakery") is an Illinois limited liability corporation with its principal place of business in Chicago, Illinois.

11. Plaintiff California Furnishings, Inc. d/b/a Sofa Outlet ("Sofa Outlet") is a California corporation with its principal place of business in San Mateo, California.

12. Plaintiff Celibré, Inc. ("Celibré") is a California corporation with its principal place of business in Torrance, California.

FIRST AMENDED COMPLAINT

**Defendant**

13.     Defendant Yelp! Inc. ("Yelp") is a Delaware corporation with its principal place of business in San Francisco, California. Yelp owns and operates Yelp.com, a popular online business directory and user-ratings website.

**INTRODUCTION AND BACKGROUND**

14.     The term "Web 2.0" describes internet websites and applications that revolve around information sharing and user-centered design. Examples of Web 2.0 websites include social networking sites (e.g., Facebook.com), video sharing sites (e.g., YouTube.com), wikis (e.g., Wikipedia.com), blogs, and many other sites that allow users to create, upload, or modify content. Web 2.0 websites thus allow internet users to do much more than simply retrieve information—the users choose what information to interact with, how they interact with it, and how to modify or add to pre-existing content.

15.     Online review applications are an increasingly popular form of Web 2.0. Companies such as Amazon.com, Best Buy, and TripAdvisor.com embed Web 2.0 applications within their websites, which allow users to rate products and services and share their experiences.

16.     Yelp.com, a website owned and operated by Defendant Yelp, is a website that utilizes Web 2.0 user-website interaction.

17.     Yelp.com consists of an online directory of businesses in multiple categories, much like an online Yellow Pages. Each business listed on Yelp.com has a unique Yelp.com listing page, which provides basic business information (such as address, phone number and hours of operation), and user-generated ratings and reviews.

18.     To rate and review businesses, internet users simply register on the Yelp.com website. Any internet user (whether registered or not) can browse Yelp.com to find ratings and reviews of businesses.

FIRST AMENDED COMPLAINT

19.     Ratings-based websites, including Yelp.com, are highly popular, and have great power to direct the flow of commerce in a given area. Users frequently read ratings and reviews for all of the businesses in a particular category and locale then decide where to spend their money based on those ratings and reviews.

20.     Yelp, however, regularly manipulates the content on Yelp.com listing pages, despite Yelp's mantra of "Real people. Real reviews." As a result, business listings on Yelp.com are in fact biased in favor of businesses that buy Yelp advertising.

21.     As part of Yelp's regular practices, the company asks business owners to pay for "protection" from bad reviews (in the form of advertising dollars) while Yelp controls whether bad reviews are posted in the first place—the classic scheme of offering "protection" from a problem that the "protector" himself creates.

## GENERAL FACTUAL ALLEGATIONS

### The Yelp Business Model

22.     Individual business listings on the Yelp.com website are created when either (a) Yelp employees or others working on behalf of Yelp or at Yelp's direction, create a new listing for a business (often around the time Yelp enters into a new geographical market), (b) reviewers not associated with Yelp create a listing for a business while, at the same time, becoming the first person to review that business, or (c) a business creates its own listing.

23.     Businesses may not opt out of being listed on the Yelp.com website.

24.     Yelp allows businesses listed on the Yelp.com website to register for a free "Business Owner Account," which provides owners with:

> (a)     the ability to track how many people view their page;
>
> (b)     the ability to update business information (such as hours of operation); and

(c)     a limited ability to send messages directly to a reviewer (for example, responding to a review), although reviewers can choose to disable this feature.

25.     Once a business listing is created, individuals registered on Yelp may rate and review the business.

26.     Individuals register on the Yelp.com website by creating an individual profile, much like a profile on popular social networking sites like Facebook.com. The profile allows individuals to choose a screen name and upload photos, including a profile photo. The individual's reviews are listed within his profile, and the profile has other functions and information such as "Friends" and "Compliments."

27.     Individuals who create profiles may do so anonymously by using a nickname or "handle," and by not including photos of themselves in their profiles. Anonymous users have the same rights to post ratings and reviews of businesses as named users.

28.     Any individual internet users, whether registered on the Yelp.com website or not, may search the Yelp.com directory, view ratings, and read reviews.

29.     Business ratings are made on a one- to five-star scale, with one star being the lowest rating, and five stars the highest.

30.     In addition to ratings, reviewers must provide a written review of the business.

31.     Business owners may not publicly (i.e., on their Yelp.com listing page) respond to reviews.

32.     Registered Yelp users may, but are not required to, vote on written reviews, rating them as either "Useful," "Funny," or "Cool." There is no negatively-spun voting criterion, such as "Not Useful," or "Thumbs Down."

33.     Yelp purports to restrict ratings and reviews which constitute or contain (a) conflicts of interest, (b) second-hand experiences or hearsay, (c) personal attacks, (d) irrelevant material, (d) plagiarism, or (e) which are left blank.

34.     Yelp also purports to "suppress" "a very small number" of reviews which its "automated software" determines are likely to be "fake."

35.     Yelp refers to this "automated software" as its "algorithm."

36.     "Suppressed" reviews remain within Yelp's system and are listed in a registered user's profile. Those reviews are not, however, displayed on the reviewed business's Yelp.com listing page, *except that* when a registered user is logged-in to Yelp and navigates to the Yelp.com listing page of a business that the user reviewed, the review appears *for that user only*. Thus logged-in users are unable to determine when their reviews have been "suppressed." While the public sees one version of the business listing (the version with the review suppressed), the reviewer sees a different version (the version where the review appears to remain intact).

37.     The Yelp.com website draws internet users with the promise that, by conglomerating reviews of individuals with first-hand experiences of local businesses, the site offers an objective ranking of competing businesses through which users can determine the relative quality of a business when deciding where to spend money. Yelp's mantra embodying this promise is "Real people. Real reviews."

38.     A business's ranking on Yelp.com has immense power to direct customers either to or away from the business. While Yelp's readership has been climbing, the website currently enjoys as least 29 million hits per month, and includes at least 8 million reviews.

39.     Yelp's only stream of revenue is through the sale of advertisements on the Yelp.com website.

40.     Compensation of Yelp's sales force is one of Yelp's largest expenses.

41.     Yelp's sales personnel are paid, in part, through commissions.

42.     As a result, there is immense pressure on Yelp sales personnel to sell advertising subscriptions.

### Yelp Sponsors

43.     Yelp offers some businesses advertising subscriptions, which vary in cost from $150 to $1,000 per month. With the subscriptions, businesses receive an "enhanced profile," and between 1,500 and 10,000 targeted ads per month depending on the level of subscription.

44.     Yelp refers to businesses that purchase advertising subscriptions as Yelp "Sponsors."

45.     Businesses may become Sponsors only if they have a significant number of reviews and a minimum 3-star rating. Consequently, every Sponsor was favorably reviewed by a majority of Yelp reviewers before becoming a Sponsor.

46.     Yelp sells advertising through the promise, express or implied, that Sponsors will see their Yelp.com rating increase and—more importantly to the business owner—that the business in turn will see increased patronage, business and, ultimately, profit.

47.     The increased rating Yelp promises is attributable to a number of "favors" Yelp provides to a business in exchange for becoming a Sponsor.

48.     Yelp admits to providing some of these favors, including:

(a)     The ability to choose or highlight <u>one</u> favorite review, which will appear and remain at the top of the Sponsor's listing page;

(b)     The privilege of showing up first in search results for similar businesses in the region;

(c)    Ads for the Sponsor appear on competitors' listing pages, while competitors' ads do not appear on the Sponsor's listing page;

(d)    The ability to post a photo slideshow;

(e)    The ability to add a "personal message" about their business;

(f)    The ability to update information on special offers and events; and

(g)    Access to an account manager who will help "maximize" the Sponsor's experience with Yelp.

49.    Yelp provides Sponsors with additional favors including:

(a)    Removing or relocating negative reviews, thereby affecting the perception of the business's quality relative to its competitors;

(b)    Creating and posting positive reviews, thereby affecting the perception of the business's quality relative to its competitors;

(c)    Allowing the business owner to determine the order in which reviews will appear;

(d)    Allowing the business owner to choose a "tagline" to be displayed on the business's Yelp listing page; and

(e)    Ensuring negative reviews will not appear in Google or other search engine results.

50.    Because these favors are designed at increasing a business's rating, they do not strongly incentivize businesses which already enjoy a four- or five-star rating.

9

51.     Thus, Yelp has an incentive to keep most businesses in a three- to four-star rating band—enough for a business to qualify for Sponsorship, but not enough for a business to be satisfied with its rating (and thus not need to purchase a Sponsorship).

### Yelp Non-Sponsors

52.     Although many businesses do not advertise on Yelp, the term "Non-Sponsor" as used in this Complaint refers only to those businesses to which Yelp offered paid advertising subscriptions, but which declined to purchase any advertising. In other words "Non-Sponsors" *could have become* Sponsors, but elected not to.

53.     Non-Sponsors see positive reviews disappear from their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

54.     Non-Sponsors see an increase in the number of negative reviews on their Yelp.com listing pages soon after declining to become a Yelp Sponsor.

55.     Sometimes such negative reviews are false, for example, concerning services or goods not offered by the business, or purporting to be from customers or patients who never patronized the business.

56.     Such false negative reviews are sometimes generated by Yelp personnel or others who act on behalf of Yelp or at Yelp's direction, or who are compensated in some form by Yelp.

57.     Although such false negative reviews violate Yelp's Terms of Service, Yelp regularly fails to remove such reviews for Non-Sponsors.

58.     At times even "true" negative reviews violate Yelp's Terms of Service, for example if they attack business owners personally, or are not based on first-hand experiences. Even in these instances, Yelp regularly fails to remove such reviews for Non-Sponsors.

59.   As a result of these consequences for declining to become a Yelp Sponsor, Non-Sponsors frequently see their Yelp.com rating significantly decrease soon after declining to become a Sponsor.

60.   The decline of their Yelp.com rating, and the posting of false negative reviews, harms Non-Sponsors, which frequently see a drop in the number of customers patronizing their businesses, and a decrease in income and profits.

### **Yelp Sponsored Events**

61.   Yelp "Sponsored Events" are parties, gatherings or other events hosted by businesses listed on the Yelp.com website.

62.   Businesses hosting Sponsored Events are expected to provide attendees with goods and services for free.

63.   To induce businesses to host free Sponsored Events, Yelp promises positive reviews of the business in exchange for the Sponsored Event.

64.   To induce businesses to host free Sponsored Events, Yelp threatens, expressly or implicitly, negative reviews if the business does not agree to host a Sponsored Event.

### **Yelp Personnel Write and Post Business Ratings and Reviews**

65.   Individuals employed by Yelp, or otherwise professionally associated with the company (for example, those working as contractors, consultants, in temporary positions, etc.), including Yelp sales people, are empowered to post ratings and reviews of businesses.

66.   For example, Yelp's CEO, Jeremy Stoppelman had posted 865 reviews as of March 1, 2010.

67.   When entering a new market, Yelp hires "Ambassadors" or "Scouts," who are individuals paid by Yelp to find and write reviews of businesses in that location.

68.   In a variety of contexts, Yelp personnel (for example sales personnel soliciting businesses to become Sponsors) threaten to write and post false negative reviews of businesses.

69.   Yelp personnel have in fact written and posted false negative reviews of businesses listed on Yelp.com.

70.   In some cases, businesses that received negative reviews from Yelp personnel are subsequently asked to purchase advertising subscriptions.

71.   In some cases, businesses that declined to purchase advertising subscriptions receive negative reviews from Yelp personnel.

**The Yelp Elite Squad**

72.   The Yelp Elite Squad is comprised of individuals Yelp touts as "the most passionate Yelpers," who Yelp says it wants to recognize and reward for being active on the site.

73.   Yelp Elite Squad members, or "Elites," may or may not be associated with Yelp. For example, Yelp CEO Jeremy Stoppelman is a Yelp Elite Squad member, but many Elites are not employed by Yelp.

74.   Yelp Elite Squad members are supposed to use their real names in their Yelp profiles, rather than a handle or nickname, and are required to upload a picture to their profiles.

75.   A Yelp Elite Squad member is identified on Yelp with an "Elite" badge adjacent to the member's name and photo in the member's reviews and on the member's profile home page.

76.   Individuals must apply to become Elite Squad members. Yelp lists the qualifications for Elite status as:

        (a)   Having lots of reviews, and reviews that are insightful, engaging and personal (aka useful, funny and cool!);

        (b)   Having profiles that really sing!;

1               (c)      Having a real photo of oneself on one's profile;

2               (d)      Using one's real name to write reviews;

3               (e)      Personal pizzazz!, or what Yelp calls "Yelptitude"; and

4               (f)      Being of legal drinking age.

77.    If individuals think they meet these criteria, they must send an email to Yelp explaining why they should be admitted into the Yelp Elite Squad.

78.    The primary benefit of becoming a Yelp Elite Squad member is receiving frequent invitations to free Yelp Sponsored Events.

79.    Yelp uses the Yelp Elite Squad as an agent of coercion, promising businesses positive reviews from Elite Squad members, or threatening negative reviews from Elite Squad members, depending upon whether a business agrees to host a free Sponsored Event and/or become a Yelp Sponsor.

80.    For example, a Yelp Elite Squad member systematically went through businesses located in an arts district in Columbus, Ohio, giving negative reviews to galleries and other businesses in the district, which he visited briefly—but did not patronize—in order to review the businesses. When asked why he was doing this, his response was "you need to contact your customers and have them put up good reviews. My goal is to get you to use Yelp."

81.    Yelp compensates Yelp Elite Squad members for their frequent reviews through the provision of free parties, goods, services and other items. Thus, Elite Squad members act as an agent of Yelp. When Elite Squad members review Yelp Sponsors, Yelp is endorsing paid advertisers.

82.    Individuals employed by Yelp also review Yelp Sponsors.

83.    Yelp does not disclose that, through Yelp employees and the Yelp Elite Squad writing reviews of Yelp Sponsors, Yelp endorses paid advertisers.

**Allegations of Misconduct**

84.    A February 18, 2009 article in the East Bay Express, titled *Yelp and the Business of Extortion 2.0*,[1] describes Yelp's unlawful business practices. According to the article:

- Yelp sales representatives contact business owners saying, "**[Y]ou have a few bad [reviews] at the top. I could do something about those. . . . We can move them. Well, for $299 a month**."

- Almost all the time when Yelp calls business owners, negative reviews are at the top of the business's Yelp.com listing page.

- Mary Seaton, the owner of a furniture store in San Mateo, **took Yelp up on an offer to remove her negative reviews if she advertised at a cost of $350 per month for six months. During that time, her negative reviews were removed and old positive ones showed up. After her contract was up, a negative review appeared**, which Seaton said contained lies.

- Greg Quinn, the owner of a San Francisco bar and bistro, said **a Yelp sales representative moved negative reviews further down his page in an effort to entice him to advertise**. The sales rep called Mr. Quinn and said, **"Did you notice what I did? Well, we can keep doing that for you."**

- An East Bay business owner said **Yelp offered to move one- or two-star reviews of his business if he advertised**.

---

[1] *Available at* http://www.eastbayexpress.com/eastbay/yelp-and-the-business-of-extortion-20/Content?oid=1176635.

- Six people told the East Bay Express that **Yelp sales representatives promised to move or remove negative reviews if their businesses would advertise**.

- Six other people told the East Bay Express that **positive reviews disappeared, or negative reviews appeared, after owners declined to advertise**.

- Yelp pays its employees to write reviews of businesses; in one documented instance, **a business owner who declined to advertise subsequently received a negative review from a Yelp employee**. In other cases, businesses that receive negative reviews from paid Yelp employees are subsequently asked to advertise.

- Yelp's Chief Operating Officer, Geoff Donaker, said advertisers and sales representatives do not have the ability to move or remove negative reviews. Donaker's denials are challenged both by local business owners, and by **a former Yelp employee, who said that several sales reps told him they promised to move reviews to get businesses to advertise**.

85.    As of February 8, 2010, there are 140 comments on the East Bay Express website following the Yelp article, many from business owners describing experiences similar to those discussed in the article.

86.    A follow-up East Bay Express article provides further evidence of Yelp's unlawful sales practices. The March 18, 2009 article, *Yelp Extortion Allegations Stack Up: More business owners come forward with tales of unethical*

*behavior by the popular San Francisco-based web site*[2] states that since the publication of the first article:

> [M]any business owners from around the country have come forward—via emails or comments on the *Express'* web site—alleging similar tales of extortionist tactics by Yelp sales reps. . . . Business owners contend that they just want [an] opportunity to respond to negative, false, or damaging information about their businesses. Instead, the only way for them to salvage their businesses' reputation is by paying Yelp—regardless of whether the reviews are true or false.
>
> . . . [S]everal [interviewees] said that the reps would offer to move negative reviews if they advertised; and in some cases positive reviews disappeared when they refused, or negative ones appeared. In one case, a nightclub owner said Yelp offered positive reviews of his business in exchange for free drinks.

87. The article tells the stories of six California business owners' experiences with Yelp:

- After Barry[3] Hyde, owner of M&M Auto Werkes in Campbell, received a negative rating from a customer's boyfriend, violating Yelp's Terms of Service (prohibiting third parties from posting reviews), he contacted Yelp sales representative Jacqueline Fitzhugh to complain. She told him, **"We can't control that, but if you advertise you can control the order that they're in." After declining, Mr. Hyde noticed some of his five-star posts were disappearing**. Yelp told him the website has a spam filter, like

---

[2] *Available at* http://www.eastbayexpress.com/eastbay/yelp-extortion-allegations-stack-up/Content?oid=1176984.

[3] The Article incorrectly identifies him as "Bob" Hyde.

Google. Hyde tracked his reviews, printing them daily to monitor which ones would disappear. Some five-star reviews stayed up for as short as 31 days and as long as 131 days. **Yelp told Hyde that if he advertised, some of those five-star reviews would come back**.

• Calvin Gee of Haight Street Dental in San Francisco saw his rating drop from five-stars to 3.5-stars following his declining to buy advertising. **Yelp reps told Gee that if he advertised, they would let him choose his favorite review and would move the negative reviews to the bottom of the page**. Gee noticed that one of his competitors, CitiDent, had two separate listings on Yelp.com. The business had more positive reviews and a higher star rating on the page that was marked a Yelp sponsor, and more negative reviews and a lower star rating on the harder to find non-sponsored page.

• Larry Trujillo owns the Uptown Nightclub in Oakland. Shortly after opening the club, a Yelp sales rep began calling him "almost daily" about advertising. The sales rep would say **"I notice you have a lot of positive reviews. We could make sure that those reviews stay positive."** Sarah Lippman, a Sales Manager at Yelp, separately **asked Mr. Trujillo for free use of his club with Yelp staff and alcohol expenses paid by the club in exchange for positive reviews on the club's Yelp.com listing page**.

• Debbie Leonardo, director of membership at the Ruby Hill Golf Club in Pleasanton, received a phone call from a **Yelp sales representative who told her that the business could get rid of its worst review if it purchased advertising**.

- Bob Kurtz, owner of Collectors Real 3 in Oakland, was contacted by a Yelp sales person after receiving a negative review. In an email, **Yelp told him that, as a paid advertiser, the negative review could be dealt with**.

- Nicholas Paul, an instructor at a Chicago art studio, declined to purchase advertising and shortly thereafter three positive reviews disappeared from and two negative ones were added to the studio's Yelp.com listing page. **A Yelp sales rep told Mr. Paul he could control that**.

88.   An August 13, 2008 article in The Register, a news website, titled *Yelp "pay to play" pitch makes shops scream for help: User generated discontent*[4] notes that:

> At least some of Yelp's sales staff hope to make money by offering to hide what you and I have to say. Over the last year, five San Francisco Bay Area business have told *The Register* that **the company has offered to "push bad reviews to the bottom" of their yelp pages if they paid to advertise on the site**. One restaurant owner was contacted "five or six" times, and each time, the Yelp sales rep insisted that if he forked over $6,000 a year for "sponsored link" status, the site would suppress user posts that put his restaurant in a less-than-positive light. "They told me I had 60 reviews on my [Yelp] page," said the owner . . . . "They told me 'No one is going to read all 60. They're only going to read the first few.'"

89.   A March 9, 2009 Chicago Tribune article, titled *Questions arise over Yelp's ads, reviews; Businesses say site rearranges opinions for price; CEO denies*,[5] reported:

---

[4] *Available at* http://www.theregister.co.uk/2008/08/13/yelp_sales_pitch/print.html

- Ina Pinkney of Ina's restaurant in the West Loop said that last summer **a Yelp salesperson offered "to move up my good reviews if I sponsored one of their events. They called it rearranging my reviews."**

- Jason Luros, an attorney at Hudson & Luros in Napa, California, stated "one of our reviews mysteriously disappeared, so I contacted Yelp and was given the usual canned response about how no humans control the reviews. But **when I said I would consider advertising if they restored the review, it mysteriously reappeared."**

90.   An April 3, 2009 article in the Santa Monica Daily Press titled *Yelp Sales Tactics Cause Concern Among Businesses*,[6] reported:

> After declining to advertise, the [Los Angeles area] business owner checked the Yelp page again and noticed that at least 10 positive reviews had disappeared while a few negative ones had been posted. . . . They estimate that at least 20 positive reviews had been deleted from the site since the conversation with Yelp about three weeks ago.

### A Summary of Yelp's Misconduct

91.   Yelp sales people represent to businesses that Yelp has the power to manipulate Yelp.com business listing pages, and that Yelp will yield that power in favor of the business if it becomes a Yelp Sponsor, and against the business if it declines to become a Yelp Sponsor.

---

[5] No longer available online.

[6] *Available at* http://www.smdp.com/Articles-c-2009-04-02-52021.113116_Yelp_sales_tactics_cause_for_concern_among_businesses.html

92.    The mere representation of the ability to manipulate page content is sufficient to instill in businesses the fear that, through such manipulation, the business will suffer if it elects not to become a Yelp Sponsor. Businesses frequently become Sponsors, not based on a cost-benefit analysis of the advertising, but simply because they fear the consequences of declining a Sponsorship.

93.    Yelp in fact manipulates Yelp.com business listing pages in favor of Yelp Sponsors and detrimentally to Yelp Non-Sponsors, including by (a) relocating or removing negative reviews of Sponsors; (b) posting positive reviews of Sponsors and urging others, such as Yelp Elite Squad members, to do the same; (c) allowing Sponsors to choose the order in which reviews appear on their Yelp.com listing pages; (d) removing positive reviews of Non-Sponsors; (e) posting negative reviews of Non-Sponsors and urging others, such as Yelp Elite Squad members, to do the same; and (f) enforcing Yelp's Terms of Service for Sponsors, but refusing to enforce Yelp's Terms of Service for Non-Sponsors.

## PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

## THE NON-SPONSOR PLAINTIFFS

### Plaintiff Cats and Dogs

94.    On September 12, 2009, Dr. Perrault, a veterinarian and the owner of Cats and Dogs, became aware of a negative review posted by "Chris R." on the Cats and Dogs Yelp.com listing page.

95.    Concerned about the review's defamatory language, possible falsity, and the adverse impact it could have on his business, Dr. Perrault cross-referenced the factual information alleged in the review with his client history.

96.    Upon finding that the review of Chris R. referenced a visit that occurred over 18 months prior to its posting (6 months outside of Yelp's 12-month policy), Javier Vargas, the Hospital Manager at Cats and Dogs, called Yelp, on or

around September 15, 2009, to request that the review be removed from the Yelp.com website for violating Yelp's review guidelines. The review was subsequently removed from the Cats and Dogs Yelp.com listing page.

97.    A second defamatory review, from "Kay K.," appeared on the Cats and Dogs Yelp.com listing page within five days of the "Chris R." review's removal. The review read:

> The only reason I am even giving one star is because it wouldn't allow me to continue without it . . . otherwise, I would have given them no stars. Dr. Perrault is the rudest vet I've ever been to . . . probably one of the rudest people I've had the displeasure of meeting. I agree with the previous reviews about making you feel like an unfit mom. My pup had been sick and I had a theory on what the problem may have been and he wouldn't even entertain the idea, but instead, made me feel bad because my dog got sick. And, my poor dog was terrified of him! He made me feel like I was 2 inches tall and repeatedly looked down his nose at me. Oh, and OVER PRICED! OMG! Who does he think he is??? I did not feel welcomed by him nor his staff. I paid you for a service! No need to treat me so bad!

98.    Soon after the appearance of these negative reviews, Dr. Perrault and Mr. Vargas began receiving frequent, high-pressure calls from Yelp sales representatives, who promised to manipulate Cats and Dogs' Yelp.com listing page in exchange for Cats and Dogs purchasing an advertising subscription.

99.    For example, on or about January 5, 2010, Cats and Dogs received a Yelp sales call from "Kevin." Kevin said that Cats and Dogs could advertise with Yelp for a minimum payment of $300 per month, with a minimum 12-month commitment. Kevin stated that if Cats and Dogs purchased a one-year advertising subscription from Yelp:

a.     Yelp would hide negative reviews on the Cats and Dogs Yelp.com listing page, or place them lower on the listing page so internet users "won't see" them;

b.     Yelp would ensure negative reviews will not appear in Google and other search engine results;

c.     Yelp would allow Cats and Dogs to decide the order that its reviews appear in on its Yelp.com listing page; and

d.     Cats and Dogs could choose its "tagline," i.e., the first few lines of a single review shown on every search result page in which Cats and Dogs appears (for instance, "Veterinarian in Long Beach").

100.   Dr. Perrault declined the offer, saying that he wanted to track referrals from Yelp for three months without ads, but might thereafter be willing to test Yelp's advertising potential.

101.   Within a week of declining Kevin's advertising offer, the negative review from Chris R. reappeared on the Cats and Dogs Yelp.com listing page.

102.   Soon after, "Kay K." posted a second negative review. This review was added on January 6, 2010, one day after Kevin's sales call:

*I've already left one review about how bad a vet Dr. Perrault is, but I wanted to add something. I've been reading other people's reviews and I must have gone to a different Cats and Dogs Animal Hospital with a vet named Dr. Perrault. Oh wait, no . . . he's the only one. Maybe it's a Dr. Jeckyl / Mr. Hyde thing?! I don't know. But the guy's an @$$. No other way around it. He's a jerk, a D-Bag, And so arrogant. I ran in to him in a neighborhood store right after he saw my poor sick dog at his clinic and he looked right at me, recognized me, rolled his eyes and looked away!!!! Seriously, someone needs to knock this guy down to the size he really is. He needs to drop his*

1
2
3
4
5
6

*Napolean complex and be a professional. After my horrible experience with him, I took my sick dog to Bixby Animal Clinic and I have never had a more pleasant vet experience! Go there instead! My dog loved everyone there! Sorry to rant, but I just wanted to get the word out there. Don't spend the money on this overpriced errogent vet. It's not worth it!*

7    103.   On or about January 12, 2010, Mr. Vargas contacted Yelp to protest
8    the reappearance of the "Chris R." review and the highly negative, inflammatory
9    "Kay K." reviews.

10   104.   On January 13, 2010, Mr. Vargas received via email the following
11   response from Yelp:

12   We wanted to let you know that we've taken a close look at the
13   reviews by Chris R and Kay K, and after careful evaluation, we have
14   decided to leave both intact. Because we don't have firsthand
15   knowledge of a reviewer's identity or personal experience, we are not
16   in a position to verify your claims that these reviewers are the same
17   person, or that they are connected to the recent vandalism at your
18   hospital. If a review appears to reflect the personal opinion and
19   experiences of the reviewer while adhering to our review guidelines
20   [link], it is our policy to allow the reviewer to stand behind his or her
21   review.

22   105.   As of January 18, 2010 Cats and Dogs enjoyed a 4-star rating (out of a
23   possible 5) on its Yelp.com listing page. Sixteen out of 26 reviews (over 60%)
24   gave Cats and Dogs a perfect 5-star rating. Despite this, as of January 18, 2010, a
25   Yelp.com search for "veterinarian in Long Beach" displayed the following tagline
26   for Dogs and Cats:

27

1       *"Dr. Perrault is the most inept/rude veterinarian I have ever met. He*

2       *had my rescue dog cowering and barking in the corner of the exam*

3       *room within seconds of meeting him.  He berated me for 20 . . ."*

4       106.   Compare Cats and Dogs' tagline to the tagline (as of January 18,

5  2010) of Bixby Animal Clinic, a Long Beach veterinary business that is a Yelp

6  Sponsor (and the same company the mysterious Kay K. referred users to in her

7  second Cats and Dogs review):

8       *"This place IS awesome. I brought my little man (Bruin) to Dr. A. as a*

9       *puppy for the puppy package. They have great hours and were able to*

10      *acommodate me AFTER work so I never had to take extra time . . . "*

11       107.   Cats and Dogs was damaged as a result of Yelp's actions, including

12  through lost patronage and prospective business.

13       108.   Cats and Dogs' experience with Yelp was not unique, but rather

14  typical of Yelp's advertisement sales tactics.

15                 **Plaintiff Astro**

16       109.   Approximately a week after responding to a negative review of Astro

17  on the Yelp.com website, Bob Gutgsell, who owns and operates Astro, received a

18  call from a Yelp sales representative asking Astro to become a Yelp Sponsor.

19       110.   The sales person stated that, if Astro became a Sponsor at a cost of

20  $400 per month, Yelp could and would remove negative reviews of the business

21  from its Yelp.com listing page. Paraphrased, the distinct impression Mr. Gutgsell

22  received from the Yelp sales person was "we take care of people who take care of

23  us."

24       111.   Mr. Gutgsell thought this was wrong and said so to the Yelp sales

25  representative in declining to purchase an advertising subscription on behalf of

26  Astro.

27

112.   Within two days of declining to become a Sponsor, Mr. Gutgsell saw several positive reviews disappear from Astro's Yelp.com listing page, leaving only a single negative review.

113.   Mr. Gutgsell contacted Yelp to ask why positive reviews of the business were disappearing. The Yelp sales representative he spoke to advised him that Yelp could "control" that, and if Astro became a Sponsor, the positive reviews could be restored.

114.   Yelp further told Mr. Gutgsell that Yelp could control the reviews and hits on Astro's Yelp.com listing page if he became a Sponsor, helping his business listing to "shine" above his competitors' listings.

115.   Astro was damaged as a result of Yelp's actions, including through lost patronage and prospective business.

116.   Astro's experience with Yelp was not unique, but rather typical of Yelp's advertisement sales tactics.

### Plaintiff Adult Socials

117.   In November, 2009, Adult Socials had several positive reviews on its Yelp.com listing page.

118.   In late November, 2009, a Yelp sales representative contacted Jack Irona, an Adult Socials employee, and proposed that Adult Socials purchase an advertising subscription.

119.   After researching Yelp and considering the offer, Mr. Irona placed a call back to the Yelp sales representative who had contacted him, and declined the offer to purchase an advertising subscription.

120.   The following day, all of Adult Socials' reviews—all positive—disappeared from Adult Socials' Yelp.com listing page.

121.   Adult Socials was damaged as a result of Yelp's actions, including through lost patronage and prospective business.

122.   Adult Socials' experience with Yelp was not unique, but rather typical of Yelp's advertisement sales tactics.

### Plaintiff Le Petite Retreat

123.   Le Petite Retreat began receiving sales calls from Yelp sales representatives in approximately June 2009, usually from Yelp employee named Michelle Mak.

124.   These sales calls were aggressive. Ms. Mak told Le Petite Retreat that, if the company purchased advertising, she would "help" with Le Petite Retreat's negative reviews and would ensure that positive reviews remained on Let Petite Retreat's Yelp.com listing page.

125.   Le Petite Retreat declined Yelp's offers to purchase advertising on several occasions. Each time, shortly after declining, Le Petite Retreat saw positive reviews removed from its Yelp.com listing page, while negative reviews remained. Approximately ten positive reviews have been removed from Le Petite Retreat's Yelp.com listing page since the company began receiving sales calls from Yelp.

126.   In September, 2009, Le Petite Retreat contacted Yelp about a false negative review that had been posted, which violated Yelp's Terms of Service. In fact, an identical review had been posted on Citysearch.com (a review website like Yelp.com) five years earlier, which prompted legal action by Le Petite Retreat. Despite violating Yelp's Terms of Service, Yelp refused to remove the review.

127.   Le Petite Retreat was damaged as a result of Yelp's actions, including through lost patronage and prospective business.

128.   Le Petite Retreat's experience with Yelp was not unique, but rather typical of Yelp's advertisement sales tactics.

### Plaintiff Mermaids Cruise

129.   In April 2009, three negative reviews of Mermaids Cruise were posted by Yelp Elite Squad members on Mermaids Cruise's Yelp.com listing page.

---

26

130.   Mermaids Cruise runs cruise events in the San Francisco Bay. The company keeps records of all persons who contact the company, regardless of whether they ultimately book a cruise.

131.   At least two of the April 2009 negative reviews by Yelp Elite Squad members were written by individuals who had never contacted or patronized Mermaids Cruise. When John Lewis, the owner of Mermaids Cruise, contacted Yelp to ask that the reviews be removed because they violated Yelp's Terms of Service (in that they were not based on first-hand experiences with the company), Yelp refused to remove the reviews.

132.   At the same time, positive reviews of Mermaids Cruise regularly disappeared within 48-72 hours of posting. Even where positive reviews remained, though, the negative Yelp Elite Squad reviews always remained prominent, located at the top of the Mermaids Cruise Yelp.com listing page.

133.   After these negative reviews appeared, Mr. Lewis received a call from a Yelp sales representative who told him that, if Mermaids Cruise became a Sponsor, Yelp could adjust the reviews so that the negative Yelp Elite Squad reviews were not so prominent.

134.   Mermaids Cruise was damaged as a result of Yelp's actions, including through lost patronage and prospective business.

135.   Mermaids Cruise's experience with Yelp was not unique, but rather typical of Yelp's advertisement sales tactics.

### Plaintiff Wag My Tail

136.   After receiving several negative reviews and seeing positive reviews disappear, a Yelp sales person called Wag My Tail seeking the company's agreement to become a Yelp Sponsor.

137.   Wag My Tail has a brick-and-mortar dog salon, and also runs a mobile grooming service. Although it is the same company performing both

1  functions, Yelp has inexplicably divided the business into two separate listings,

2  one for the salon and one for the mobile service.

3    138.   The Yelp sales representative who contacted Wag My Tail told the

4  company that if it advertised at a rate of $135 per month for the Wag My Tail

5  salon, and $270 per month for the mobile service, the representative's "assistant"

6  could help to manage the issues Wag My Tail was complaining about, and would

7  help the company better its rating. Wag My Tail has declined to become a Sponsor.

8    139.   Potential customers have told Wag My Tail that they have chosen not

9  to patronize the business based on Yelp reviews.

10    140.   Wag My Tail was damaged as a result of Yelp's actions, including

11  through lost patronage and prospective business.

12    141.   Wag My Tail's experience with Yelp was not unique, but rather

13  typical of Yelp's advertisement sales tactics.

14                    **Plaintiff Scion**

15    142.   Scion opened in Washington, D.C., in June 2009. In August, 2009,

16  Julie Liu, Scion's owner and operator, signed up for a free Yelp Business Owner

17  Account. Two weeks later, Ms. Liu began receiving calls from Yelp sales

18  representatives, offering Scion advertising packages. The calls were from different

19  Yelp sales representatives and occurred approximately bi-weekly.

20    143.   A Yelp sales representative told Ms. Liu that negative reviews could

21  be removed with the payment of fees. Concerned that if she agreed, negative

22  reviews could be continuously added to Scion's Yelp.com listing page in order to

23  solicit more fees—a process which might be never-ending and completely out of

24  her control—Ms. Liu questioned the sales representative as to how she could be

25  sure that Yelp would not post negative reviews itself in order to request more fees

26  from Scion. The sales representative hung up on Ms. Liu. When Ms. Liu attempted

27  to call the sales representative back, there was no answer.

144.   After two months of receiving sales calls and discussing the possibility of becoming a Sponsor, Ms. Liu unequivocally declined to do so. The following day, approximately five 5-star reviews disappeared from Scion's Yelp.com listing page, and three negative reviews were posted to the page.

145.   Two of the new negative reviews were <u>demonstrably false</u>. The reviews commented on a menu that was still posted on Scion's website, but that Scion was no longer actually using at the time the experiences described in the reviews supposedly took place.

146.   Scion was damaged as a result of Yelp's actions, including through lost patronage and prospective business.

147.   Scion's experience with Yelp was not unique, but rather typical of Yelp's advertisement sales tactics.

## **THE SPONSOR PLAINTIFFS**

### **Plaintiff Bleeding Heart Bakery**

148.   Bleeding Heart Bakery has two locations in Chicago. Each location has a separate Yelp.com listing page.

149.   Beginning in 2007, Yelp began calling Michelle Garcia, Bleeding Heart Bakery's owner and operator, including on her personal cell phone, trying to get Ms. Garcia to purchase a Yelp advertising subscription on behalf of the Bleeding Heart Bakery.

150.   On one or more occasions on these phone calls, Ms. Garcia pointed out that some reviews of the Bleeding Heart Bakery were demonstrably "bogus," for example, purporting to describe an experience that occurred on a day that Bleeding Heart Bakery was closed.

151.   A Yelp sales person calling Ms. Garcia promised that, if she agreed to purchase an advertising subscription, Yelp would push bad reviews to the very end of Bleeding Heart Bakery's Yelp.com listing pages, and that the sales

representative would personally remove the "bogus" reviews Ms. Garcia complained of.

152.   Yelp further promised Ms. Garcia that, as a Yelp Sponsor, she would be allowed to choose her favorite <u>ten</u> reviews, which would always appear at the top of Bleeding Heart Bakery's Yelp.com listing pages.

153.   Yelp further promised Ms. Garcia that, as a Yelp Sponsor, she could choose which pictures uploaded by reviewers would appear on Bleeding Heart Bakery's Yelp.com listing pages, and which would be removed.

154.   Based on these promises, in November, 2008 Ms. Garcia agreed to purchase an advertising subscription from Yelp. Although Yelp had urged her to purchase a sponsorship for just one of the Bleeding Heart Bakery's Yelp.com listing pages for $500 per month, Ms. Garcia eventually negotiated a deal that would cover both of the Bleeding Heart Bakery's Yep.com listing pages for $600 per month. The term of the contract was one year. Ms. Garcia paid the first month's charge by credit card, and Yelp automatically charged subsequent months to her credit card on a monthly basis.

155.   At the time Bleeding Heart Bakery became a Yelp Sponsor, the company enjoyed a 4-star Yelp rating.

156.   During the same month that Bleeding Heart Bakery became a Yelp Sponsor, six negative reviews of the business were posted by Yelp Elite Squad members. Some of the reviews contained personal attacks. During the same time, several 4-star reviews disappeared from Bleeding Heart Bakery's Yelp.com listing page.

157.   As a result of the new negative reviews and disappearing positive reviews, Bleeding Heart Bakery's rating dropped to 3.5-stars.

158.   As a result of these negative reviews, Bleeding Heart Bakery's business suffered. For example, during a week following the posting of these

1   negative reviews by Yelp Elite Squad members, Bleeding Heart Bakery went from

2   typical sales of 300 cupcakes per week, to just 24 cupcakes, and was forced to

3   throw out the remainder of its inventory.

4       159.   When Ms. Garcia called Yelp to complain about the reviews,

5   including the personal attacks, Yelp told her that if she became a "premier"

6   advertiser—at a higher cost—Yelp would talk to the Yelp Elite Squad and "ask

7   them to give the business another shot."

8       160.   Yelp further told Ms. Garcia said that if Bleeding Heart Bakery

9   increased the amount of its advertising subscription to become a "premier"

10  advertiser, Yelp would bring Bleeding Heart Bakery's star rating back up.

11      161.   Bleeding Heart Bakery's experience with Yelp was not unique, but

12  rather typical of Yelp's advertisement sales tactics.

13                          **Plaintiff Sofa Outlet**

14      162.   Mary Seaton, Sofa Outlet's owner, received a call from a Yelp sales

15  representative, who told her that, if Sofa Outlet agreed to purchase an advertising

16  subscription, Sofa Outlet's positive reviews would be made more prominent while

17  Sofa Outlet's negative reviews would be made less prominent and, eventually,

18  removed altogether.

19      163.   On January 25, 2008, Mary Seaton entered into a $350 per month

20  advertising subscription with Yelp on behalf of Sofa Outlet.

21      164.   Sofa Outlet cancelled its advertising subscription on June 17, 2008,

22  which was officially terminated June 20, 2008.

23      165.   Within approximately two weeks of Sofa Outlet's termination date,

24  many positive reviews that Sofa Outlet had received, especially those written

25  during the subscription period, disappeared from the Sofa Outlet Listing Page,

26  while negative reviews that had been previously removed reappeared.

27

1    166.   Sofa Outlet's experience with Yelp was not unique, but rather typical

2 of Yelp's advertisement sales tactics.

3                          **Plaintiff Celibré**

4    167.   Celibré is currently a Yelp Sponsor, having purchased an advertising

5 subscription in January, 2010 at a cost of $300 per month.

6    168.   Celibré became a Yelp Sponsor because a Yelp sales representative

7 promised Kevin DiCerbo, Celibré's owner, that Yelp would allow Celibré to

8 choose the order of reviews on its Yelp.com listing page in exchange for becoming

9 a Sponsor.

10    169.   Yelp has in fact moved reviews on Celibré's Yelp.com listing page

11 according to Celibré's wishes.

12    170.   Celibré's experience with Yelp was not unique, but rather typical of

13 Yelp's advertisement sales tactics.

14          **CLASS REPRESENTATION ALLEGATIONS**

15    171.   Plaintiffs bring this action on behalf of themselves and the following

16 Classes:

17                     **The Sponsor Class**

18 All persons and entities (excluding officers, directors, and employees
of Yelp) in the United States who, from October 1, 2004 to the

19 present, as a result of Yelp offering or threatening to manipulate a
Yelp.com listing page in exchange for purchasing or declining to

20 purchase advertising services, purchased advertising services from

21 Yelp.

22               **The Non-Sponsor Class**

23 All persons and entities (excluding officers, directors, and employees
of Yelp) in the United States to whom, from October 1, 2004 to the

24 present, Yelp offered or threatened to manipulate a Yelp.com listing

25 page in exchange for purchasing or declining to purchase advertising,
and who declined to purchase advertising.

26

27    172.   Like Plaintiffs, all members of the Non-Sponsor and Sponsor Classes

have a Yelp.com listing page.

173.   Like Plaintiffs, all members of the Non-Sponsor and Sponsor Classes were contacted by Yelp sales representatives and asked to buy advertising subscriptions from Yelp.

174.   Like Plaintiffs, all members of the Non-Sponsor and Sponsor Classes were promised that, if they purchased advertising from Yelp, negative reviews would be removed or relocated from their Yelp.com listing pages, or those pages would otherwise be favorably manipulated, including through their own input or control.

175.   Like Plaintiffs, all members of the Non-Sponsor and Sponsor Classes were threatened, implicitly or expressly, that if they did not purchase advertising from Yelp, their Yelp.com listing pages would be detrimentally manipulated, including for example, by removing positive reviews and posting new, negative reviews.

176.   Like Non-Sponsor Plaintiffs Cats and Dogs, Astro, Adult Socials, Le Petite Retreat, Mermaids Cruise, Wag My Tail, and Scion, all members of the Non-Sponsor Class declined to become a Yelp Sponsor.

177.   Like Non-Sponsor Plaintiffs Cats and Dogs, Astro, Adult Socials, Le Petite Retreat, Mermaids Cruise, Wag My Tail, and Scion, all members of the Non-Sponsor Class saw their Yelp.com listing pages detrimentally modified after declining to become a Yelp Sponsor.

178.   Like Non-Sponsor Plaintiffs Cats and Dogs, Astro, Adult Socials, Le Petite Retreat, Mermaids Cruise, Wag My Tail, and Scion, all members of the Non-Sponsor Class were damaged as a result of Yelp's actions.

179.   Like Sponsor Plaintiffs Bleeding Heart Bakery, Sofa Outlet and Celibré, all members of the Sponsor Class purchased advertising subscriptions from Yelp based on Yelp's promises and threats, express or implicit.

FIRST AMENDED COMPLAINT

180.   Like Sponsor Plaintiffs Bleeding Heart Bakery, Sofa Outlet and Celibré, all members of the Sponsor Class would not have purchased advertising subscriptions with Yelp absent Yelp's promises and threats, express or implicit.

181.   Plaintiffs' claims on behalf of the Class are maintainable under Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

182.   The questions of law and fact common to Plaintiffs and the Classes include:

a.   Whether Yelp extorted the Sponsor Plaintiffs and members of the Sponsor Class;

b.   Whether Yelp attempted to extort Plaintiffs and members of the Classes;

c.   Whether Yelp intentionally interfered with the prospective economic advantage of Plaintiffs and members of the Classes;

d.   Whether Yelp violated the "unlawful" prong of California's Unfair Competition Law, including by:

   i.   Committing Extortion in violation of Cal. Pen. Code §§518-19;

   ii.   Committing Attempted Extortion in violation of Cal. Pen. Code §524;

   iii.   Intentionally interfering with the Non-Sponsor Plaintiffs' and Non-Sponsor Class Members' Prospective Economic Advantages; and

   iv.   Violating 16 C.F.R. Part 255 by failing to disclose that Yelp provides endorsed reviews of paid advertisers;

e.   Whether Yelp violated the "unfair" prong of California's Unfair Competition Law;

f.   Whether Yelp violated the "fraudulent" prong of California's Unfair Competition Law;

g.   Whether Plaintiffs and the Classes were injured by the conduct complained of herein;

h.   Whether the conduct described herein is ongoing;

i.   Whether Plaintiffs and members of the Classes are entitled to damages;

34

j.    Whether Plaintiffs and members of the Classes are entitled to injunctive relief; and

k.    Whether Plaintiffs and members of the Classes are entitled to restitution.

## CLAIMS FOR RELIEF

### COUNT I

**Extortion**
**Cal. Pen. Code §§ 518-19**
**(With Respect to the Sponsor Plaintiffs and Sponsor Class)**

183.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

184.   By the advertising and reviewing practices of Yelp as alleged herein, Yelp obtained the property of the Sponsor Plaintiffs and members of the Sponsor Class, with their consent, through the threat to do an unlawful injury to the person or property of the Sponsor Plaintiffs and members of the Sponsor Class threatened.

185.   Yelp's conduct constitutes a violation of Cal. Pen. Code §§ 518-19.

### COUNT II

**Attempted Extortion**
**Cal. Pen. Code § 524**
**(With respect to All Plaintiffs and All Classes)**

186.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

187.   By the advertising and review practices of Yelp as alleged herein, Yelp attempted to obtain the property of Non-Sponsor Plaintiffs and members of the Non-Sponsor class, with their consent, through the threat to do an unlawful injury to the person or property of the Non-Sponsor Plaintiffs and members of the Non-Sponsor Class.

188.   Yelp had a specific intent to commit Extortion, in violation of Cal. Pen. Code §§ 518-19, against the Non-Sponsor Plaintiffs and Non-Sponsor Class.

189.   Yelp engaged in one or more direct ineffectual acts towards the commission of Extortion against the Non-Sponsor Plaintiffs and members of the Non-Sponsor Class.

190.   The Non-Sponsor Plaintiffs and members of the Non-Sponsor Class were harmed as a result of Yelp's actions.

191.   The foregoing constitutes Attempted Extortion in violation of Cal. Pen. Code § 524.

## COUNT III

### Intentional Interference With Prospective Economic Advantage
### (With Respect to All Plaintiffs and All Classes)

192.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

193.   There existed economic relationships between the Non-Sponsor Plaintiffs and Non-Sponsor Class members, and third parties, with the probability of future economic benefit to the Non-Sponsor Plaintiffs and Non-Sponsor Class Members.

194.   Yelp knew of these relationships.

195.   Yelp intentionally committed wrongful acts designed to disrupt those relationships.

196.   Those relationships were actually disrupted.

197.   The Non-Sponsor Plaintiffs and Non-Sponsor Class members suffered economic harm proximately caused by Yelp's acts.

1

## COUNT IV

2

**Violations of the Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200**
**(With Respect to All Plaintiffs and All Classes)**

3

4

5      198.   Plaintiffs reallege and incorporate the allegations elsewhere in the

6    Complaint as if set forth in full herein.

7                                          "Unlawful"

8      199.   Yelp violated Cal. Pen. Code §§ 518-19.

9      200.   Yelp violated Cal. Pen. Code § 524.

10      201.   Yelp intentionally interfered with prospective economic advantages

11    held by the Non-Sponsor Plaintiffs and members of the Non-Sponsor Class.

12      202.   Yelp violated 16 C.F.R. Part 255 by failing to disclose that the

13    Yelp.com website provides endorsed reviews of Sponsors.

14      203.   The practices of Yelp complained of herein therefore violated the

15    "unlawful" prong of the California Unfair Competition Law.

16                                           "Unfair"

17      204.   The   practices   of   Yelp   complained   of   herein   are   immoral,

18    unscrupulous, and offend public policy.

19      205.   The practices of Yelp complained of herein had no countervailing

20    benefit to consumers or competition when weighed against the harm caused by

21    such practices.

22      206.   The practices of Yelp complained of herein therefore violated the

23    "unfair" prong of the California Unfair Competition Law.

24                                         "Fraudulent"

25      207.   Yelp's conduct constitutes "fraudulent" business acts and practices

26    because the conduct has a tendency to deceive the Plaintiffs and the Classes, and

27    the general public.

208.   The advertising sales and employee reviewing practices of Yelp as alleged herein therefore violated the "fraudulent" prong of the California Unfair Competition Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment and relief against Yelp! Inc. as follows:

A.   Declaring this action to be a proper class action and appointing the undersigned law firms as class counsel;

B.   An order permanently enjoining Yelp from engaging in the practices complained of herein;

C.   An order compelling Yelp to disgorge all monies, revenues, and profits obtained by means of its wrongful acts and practices;

D.   An order requiring Yelp to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be unlawful, plus pre- and post- judgment interest thereon;

E.   Damages suffered as a result of Yelp's acts, in an amount to be determined at trial;

F.   Punitive damages;

G.   Costs, expenses, and reasonable attorneys' fees; and

H.   Any other and further relief the Court deems necessary, just, or proper.

//
//
//
//
//

1

## JURY DEMAND

2

Plaintiffs demand a trial by jury.

3

4      DATED: March 17, 2010                    Respectfully Submitted,

5

6

7

8                                              Gregory S. Weston

9
                                               THE WESTON FIRM
10                                             Gregory S. Weston
                                               Jack Fitzgerald
11                                             888 Turquoise Street
                                               San Diego, CA 92109
12                                             Telephone: (858) 488-1672
                                               Facsimile: (480) 247-4553
13

14
                                               BECK & LEE BUSINESS TRIAL
15                                             LAWYERS
                                               Jared H. Beck
16                                             Elizabeth Lee Beck
                                               Courthouse Plaza Building
17                                             28 West Flagler Street, Suite 555
18                                             Miami, FL 33130
                                               Telephone: (305) 789-0072
19                                             Facsimile: (786) 664-3334
20

21                                             **Attorneys for Plaintiffs and the
22                                             Proposed Classes**

23

24

25

26

27

FIRST AMENDED COMPLAINT